# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| American Litho, Inc., <br> a Michigan corporation, | Civil No. 08-CV-5892 (JMR/SRN) |
| Plaintiff, | REPORT & RECOMMENDATION |
| v. | |
| Imation Corp., <br> a Delaware corporation, | |
| Defendant. | |

Richard A. Gaffin, Miller, Canfield, Paddock & Stone, PLC, 99 Monroe Ave. NW, Suite 1200, Grand Rapids, Michigan 49503 and John D. Schrager, Wagner, Falconer & Judd, Ltd., 80 S. 8th Street, Suite 1700, Minneapolis, Minnesota 55402, for Plaintiff

David B. Potter and David A. Prange, Oppenheimer, Wolff & Donnelly, LLP, 45 S. 7th Street, Suite 3300, Minneapolis, Minnesota 55402, for Defendant

_____

SUSAN RICHARD NELSON, United States Magistrate Judge

This matter is before the Court on Defendant's Motion for Partial Summary Judgment (Doc. No. 47). The matter has been referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1(a). (See Order of 8/19/09, Doc. No. 53.) For the reasons set forth herein, the Court recommends that Defendant's Motion for Partial Summary Judgment be denied.

## I.    FACTUAL AND PROCEDURAL HISTORY

This case involves breach of contract, fraudulent inducement and negligent misrepresentation claims related to a license agreement. On March 15, 2005, Plaintiff American Litho, Inc. ("American Litho") and Defendant Imation Corp. ("Imation") executed a license

1

agreement (the "License Agreement") to practice U.S. Patent Nos. 6,605,416 (the "'416 Patent") and RE 38,251 (the "'251 Patent") to allow Plaintiff to use Imation's patented infra-red dye for developing a near infra-red printing plate. Plaintiff alleges that Defendant represented and warranted that it had the right to grant a non-exclusive license to practice the '416 Patent. (Am. Complaint ¶¶ 6-7.)

Stan Busman, an Imation chemist and one of the inventors of Imation's patented dyes, worked with American Litho to identify ways in which Imation could assist American Litho in the development of a thermal printing plate. (Busman Dep. at 6-7, 16-18, 59-66, 93-94, Ex. G to Decl. of Joseph D. Kantor in Supp. Pl.'s Mem. Opp'n Def.'s Mot. Partial Summ. J.; Levinson Dep. at 68-69, Ex. C to Decl. of Joseph D. Kantor in Supp. Pl.'s Mem. Opp'n Def.'s Mot. Partial Summ. J.) Busman suggested that American Litho could use the patented dyes in developing a thermal plate and suggested that American Litho seek a non-exclusive license from Imation to practice the patented dyes. (Busman Dep. at 71-75, 92-94, 107-08, Ex. G to Pl.'s Mem.; Email of 8/20/04 from S. Busman to S. Klotz, T. Dominique, J. Huizenga, Ex. K. to Pl.'s Mem.) Mr. Busman contacted Eric Levinson, Imation's Executive Director of Intellectual Property and Assistant General Counsel, to see whether Imation could license the patents to American Litho for that purpose. (Busman Dep. at 104-06, 113-14, Ex. G to Pl.'s Mem.; Emails of 12/21/04-1/6/05 between S. Busman and R. Wax, Ex. L to Pl.'s Mem.; Sullivan Dep. at 44, Ex. D to Pl.'s Mem.; Email of 1/26/05 from E. Levinson to C. Blanker, S. Busman, Ex. N to Pl.'s Mem.) Levinson told him that Imation could grant American Litho a non-exclusive license to use the patents. (Busman Dep. at 109-110, Ex. G to Pl.'s Mem.; Levinson Dep. at 65-72, 89-97, Ex. C to Pl.'s Mem.)

On behalf of Imation, Eric Levinson drafted and negotiated the License Agreement. (Levinson Dep. at 111, Ex. B to Decl. of David A. Prange in Supp. Def.'s Mem. Supp. Mot. Partial Summ. J.) Plaintiff's president, Steven Klotz, negotiated the agreement on behalf of Plaintiff. (Klotz Dep. at 16, 108-109, Ex. C to Def.'s Mem.).

The License Agreement contains the following damage limitation provision:

> IT IS UNDERSTOOD AND AGREED THAT NEITHER PARTY SHALL BE LIABLE TO THE OTHER UNDER BREACH OF CONTRACT, WARRANTY, NEGLIGENCE, STRICT LIABILITY OR ANY OTHER LEGAL THEORY FOR ANY INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL LOSS, EXPENSE, DAMAGES, DEMANDS, ACTIONS OR CAUSES OF ACTION OR ANY OTHER CLAIMS WHATSOEVER (INCLUDING, BUT NOT LIMITED TO, LOSS OF PROFIT, INVESTMENT, GOODWILL, BUSINESS OR BUSINESS OPPORTUNITY) OR FOR ANY PUNITIVE DAMAGES ARISING OUT OF OR RESULTING FROM THIS AGREEMENT OR THE TERMINATION OF THIS AGREEMENT.

(License Agreement § 6.3, Ex. A to First Am. Complaint, Doc. 21-1.)

Plaintiff set out to incorporate the patented dyes into its thermal plate project and, as of October 2005, had beta tested its thermal plates, which incorporated one of the patented dyes, and had already sold the product to some customers. (Wax Dep. at 20-32, Ex. O to Pl.'s Mem.)[1]

On October 17, 2005, the General Counsel for Kodak Polychrome Graphics ("Kodak") – to whom Defendant had previously granted an exclusive license to the patents in question – emailed Defendant's General Counsel about "a rumor" he had heard that American Litho was incorporating one of the patented dyes into the thermal plate it was developing. (See email of 10/25/05 from E. Levinson to A. Buharin, Ex. P to Pl.'s Mem.; Agreement between Imation and

---

[1] On October 1, 2005, Konica Minolta Graphic Imaging U.S.A., Inc. ("MGUS"), acquired American Litho, which became a wholly-owned subsidiary of MGUS. (Wax Dep. at 22, Ex. E to Def.'s Mem.)

KPG, Ex. E to Pl.'s Mem. § 1.20.2, 1.20.4.)  Imation investigated the situation, and on January 19, 2006, Defendant informed Plaintiff that at the time the License Agreement was executed, Defendant did not have the right to grant the License because of an earlier agreement between it and Kodak.  (Am. Complaint ¶¶ 8-9.)

In an effort to mitigate its damages, Plaintiff designed different technology to avoid the '416 Patent.   Plaintiff claims that this "design around" process took almost a year and it incurred over $1,000,000 in out-of-pocket costs and charges in connection with developing the alternative technology and damages for lost sales, profits and market share.  (Am. Complaint ¶ 11; Newton Dep. at 198-99, Ex. R to Pl.'s Mem.; American Litho Damages Report, Ex. S to Pl.'s Mem.)

Imation brings this Motion for Partial Summary Judgment, arguing that pursuant to the express terms of the damage limitation provision in the License Agreement, Plaintiff's claimed damages for lost profits and consequential damages are barred.  Imation contends that the provision is enforceable as the License Agreement was a mutual agreement made between two sophisticated, commercial parties and the provision is not ambiguous.  Accordingly, Imation contends that there exists no genuine dispute regarding this material fact and that it is entitled to judgment as a matter of law on this issue.

Opposing Defendant's motion, Plaintiff argues that, for public policy reasons, a party cannot contractually limit its liability for breach of contract if the breach involves intentional or grossly negligent acts.  Plaintiff maintains that whether Defendant's conduct was intentional or grossly negligent is an issue of fact for the jury, rendering summary judgment inappropriate.

## II. DISCUSSION

### A. Standard of Review

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56; see also e.g. Myers v. Lutsen Mountains Corp., 587 F.3d 891, 893 (8th Cir. 2009).

The burden is on the moving party to show that the entry of summary judgment is appropriate. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," then Rule 56 requires the entry of summary judgment in favor of the moving party. Id. at 322-23. All evidence will be viewed in the light most favorable to the nonmoving party. Vette Co. v. Aetna Cas. & Surety Co., 612 F.2d 1076, 1077 (8th Cir. 1980).

### B. Enforceability of the Damage Limitation Provision

Defendant cites to a group of cases as authority for the proposition that damage limitation provisions are enforceable under Minnesota law, including Transport Corp. of America, Inc. v. International Bus. Machines Corp., Inc., 30 F.3d 953 (8th Cir. 1994) (holding that seller properly disclaimed consequential damages in agreement between buyer and seller); Piper Jaffray & Co. v. SunGard Systems Int'l, Inc., 04-CV-2922 (RHK/JSM), 2004 WL 2222322 (D. Minn. Sept. 30, 2004) (applying Pennsylvania law and finding, in a computer software and services agreement, that a waiver of liability for consequential and incidental damages was enforceable and not

unconscionable); Taylor Investment Corp. v. Weil, 169 F.Supp.2d 1046 (D. Minn. 2001) (holding that damage limitation provisions were enforceable under the UCC in a sales and license agreement for computer software); International Fin. Services, Inc. v. Gerber Scientific Instrument Co., 534 N.W.2d 261 (Minn. 1995) (holding, in breach of warranty action involving a defective piece of equipment, that contract's consequential damages exclusion was not unconscionable and remained valid); and Kevin M. Ehringer Enterprises, Inc. v. McData Services Corp., 3:06-CV-812-L, 2009 WL 561181 (N.D. Tex. March 4, 2009) (applying Minnesota law and concluding that a limitation of damages provision between two commercial parties was enforceable under the UCC). Under these cases, courts generally address the enforceability of the applicable contract in a two-step fashion, asking first whether the provision in question fails of its essential purpose, then examining whether the provision is unconscionable. See, e.g., Piper Jaffray, 2004 WL 2222322 at * 5-7; Taylor Investment Corp., 169 F.Supp.2d at 1058-1060.

Defendant argues that the rule in Minnesota is different for limitation of damages provisions, as in the cases cited above in which such clauses were held to be enforceable, as opposed to exculpatory clauses, which, Defendant argues, Minnesota courts have held to be unenforceable as violative of public policy. As examples of cases involving exculpatory provisions, Imation points to two cases relied upon by Plaintiff, Honeywell, Inc. v. Ruby Tuesday, Inc., 43 F.Supp.2d 1074 (D. Minn. 1999), and Beehner v. Cragun Corp., 636 N.W.2d 821 (Minn. Ct. App. 2001).

Plaintiff, however, responds that whether the contractual provision is exculpatory or a limitation of damages is irrelevant because regardless of the type of provision, a party engaging

6

in gross negligence remains liable for its conduct. Moreover, Plaintiff contends that the cases cited by Defendant are inapplicable because they involve the Uniform Commercial Code ("UCC"), rather than common law legal precepts, which Plaintiff argues are applicable to the License Agreement.

In order to consider the applicable law, the Court must first determine whether the license agreement is governed by Article II of Minnesota's version of the UCC, Minn. Stat. §§ 336.2-101 *et seq.*, or whether the agreement falls within the purview of the common law of contracts. Imation does not directly address this issue, but instead simply cites to decisions under the UCC. In a similar vein, Plaintiff cites to cases decided under common law and does not expressly raise this issue in its memorandum. However, in Plaintiff's oral argument, it noted that the UCC line of authority was inapplicable. In response, Defendant Imation argued at the hearing that Piper Jaffray & Co., 2004 WL 2222322, one of its cited cases, involved both products and services, so whether the contract is governed by the UCC or common law is not necessarily determinative.

The UCC applies to "transactions in goods." Minn. Stat. § 336.2-102. "Goods" are defined in the Code as "all things (including specially manufactured goods) which are moveable at the time of identification to the contract for sale . . . ." Minn. Stat. § 336.2-105. The UCC does not apply to transactions involving services. When an agreement involves both goods and services, Minnesota courts use the predominant purpose test to determine whether the hybrid transaction is governed by the UCC as a contract for the sale of goods. AKA Dist. Co. v. Whirlpool Corp., 948 F.Supp. 903, 905 (D. Minn. 1996), aff'd, 137 F.3d 1083.

The contract here provides that the licensor, Imation, grants the licensee, American Litho, "a non-exclusive, nontransferable, royalty-bearing license . . . under the Licensed Patent to

7

make, have made, use, offer to sell, and sell Licensed Products." (License Agreement § 2, Ex. A to First Am. Complaint.) The "Licensed Products" in question are "negative-acting, near-infrared-sensitive, thermal lithographic offset printing plates covered by the Licensed Patents," in other words, the products to be developed by American Litho. (Id., § 1.2). Any "goods" contemplated in this agreement appear to be the goods that American Litho hoped to manufacture through the use of Imation's patents – not "goods" sold by Imation to American Litho. This is consistent with the general principle in patent licensing that "a mere license is not deemed to constitute any interest in the patent. A license is but a promise by one having an interest in a patent to forebear from suing one who would commit what would be, but for the license, an infringement of that interest." See 3 John Gladstone Mills, III, et al., Patent Law Fundamentals § 19:5 (2d ed.2009). Therefore, the Court concludes that the License Agreement was for services, not goods, and that decisions under the UCC are not binding precedent here.

Notwithstanding that conclusion, the Court notes that like the UCC decisions cited by Defendant, this is a commercial transaction in which the parties mutually agreed to a limitation of damages clause. See Transport Corp. of America, 30 F.3d at 960 (stating, "An exclusion of consequential damages set forth in advance in a commercial agreement between experienced business parties represents a bargained-for allocation of risk that is conscionable as a matter of law."); International Fin. Services, 534 N.W.2d at 269 (holding that where the parties were both merchants and there was no disparity in bargaining power and the case involved a commercial loss, it was not unconscionable to enforce the allocation of risk incorporated into the contract); Taylor Investment Corp., 169 F.Supp.2d at 1059 (finding exclusion for consequential damages enforceable where parties were both relatively sophisticated and the claim was for commercial

8

loss); see also, Kevin M. Ehringer Enterprises, 2009 WL 561181 at *7 (noting that the limitation of damages provisions were what the parties bargained for).

However, common law governs the overriding analysis here, particularly this Court's precedent in Honeywell, 43 F.Supp.2d at 1074, in which an exculpatory clause in a contract was found invalid to the extent that it purported to release a party from all liability for intentional, willful or wanton acts. In Honeywell, the plaintiff, which manufactured, installed and monitored its fire and burglar alarms, had alarm system contracts with the defendant restaurant chain, Ruby Tuesday, Inc. ("RTI"). Id. at 1075. After what RTI alleged were a series of alarm system failures, it stopped making payment on its contracts with Honeywell. Honeywell filed suit claiming breach of contract and unjust enrichment, and RTI counterclaimed, alleging that Honeywell itself had breached the contracts. Id. at 1075-76. Honeywell argued that certain clauses in the contracts protected it from liability, including a clause that expressly disclaimed all express or implied warranties with respect to the security systems. Id. at 1079-80.

Under Minnesota common law, this Court noted, contractual provisions limiting liability are generally disfavored. Id. at 1079 (citations omitted). This Court held that while the alarm system contracts would otherwise be enforceable, the limiting provisions did not foreclose RTI from bringing a counterclaim based on Honeywell's willful negligence or intentional acts, id. (citing Morgan Co. v. Minnesota Mining & Mfg. Co., 246 N.W.2d 443, 448 (1976) (finding an exculpatory clause valid as to acts of negligence but not to claims of willful and wanton negligence, intentional misconduct, and fraud and misrepresentation); Armi v. Huckabee, 94 So.2d 380, 384 (holding that an exculpatory clause may not bar claims for active negligence)), nor could the limiting provisions restrict the monetary amount of Honeywell's liability for such

9

conduct. Id. (citing D.L. Lee & Sons v. ADT Sec. Systems, Mid-South, Inc., 916 F.Supp. 1571, 1583 (S.D. Ga. 1995). This Court did not establish a per se rule in Honeywell that parties could not mutually agree to limit damages. Instead, the Court concluded that a fact issue remained as to the question of gross or willful negligence, and that parties cannot contractually limit liability for such conduct for reasons of public policy.

In Honeywell, this Court held that RTI had alleged conduct sufficient to meet the threshold of willful negligence, which arises when there has been "'a reckless disregard of the safety of the person or property of another by after and not before discovering the peril to exercise ordinary care to prevent the impending injury.'" Id. (citing Peterson v. Honeywell, No. C2-93-1795, 1994 WL 34200 at *4 (Minn. Ct. App. Feb. 8, 1994) (internal citation omitted). Other Minnesota decisions have defined "gross negligence" in similar terms, including "very great negligence or absence of even slight care." Ackerman v. American Family Mut. Ins. Co., 435 N.W.2d 835, 840 (Minn. Ct. App. 1989).

Plaintiff also cites to Beehner, 636 N.W.2d 821, for the proposition that a party may not rely on a contract's limitation of liability provision unless it can show that its conduct was "no-greater-than ordinary negligence." (Pl.'s Mem. Opp'n Def.'s Mot. Partial Summ. J. at 10.) In Beehner, a resort guest was injured when she was thrown from a horse startled by a tag-along dog during a trail ride. The ticket she had purchased for the ride purported to release the resort from liability for ordinary negligence, but carved out liability in cases of gross negligence. Beehner, 636 N.W.2d at 829-30. While Beehner provides general authority for negligence precepts under Minnesota law, the case is not directly applicable, as it involves a wholly different type of contract. Unlike a contract between two commercial entities, Beehner involved

10

a one-way release clause essentially imposed upon a consumer. Honeywell, involving a contract between two sophisticated commercial parties, in a suit sounding in contract law, is the applicable legal precedent for this Court's analysis.

In light of Honeywell, there remains an issue of fact for the jury here. Plaintiff's causes of action and damages claims therefore survive this motion, although Plaintiff's damages may ultimately be limited to its actual losses. Despite the damage limitation provision in the contract, Plaintiff has alleged a fact issue as to whether Imation's conduct was egregious enough to fall into a public policy exception that prohibits the limitation of liability for willful or gross negligence.

For example, Plaintiff cites to instances in which Defendant failed to investigate whether it had given Kodak an exclusive license to practice its patents. Plaintiff maintains that Imation's chemist/inventor Busman and others at Imation had internally discussed American Litho's use of the patented dyes to develop a thermal plate before Imation and American Litho began discussing the license. (Busman Dep. at 104-06, 113-14, Ex. G. to Pl.'s Mem.; Email of 1/6/05 from S. Busman to R. Wax, Ex. L to Pl.'s Mem.) It is undisputed that this contemplated use fell within the exclusive license agreement that Imation had given to Kodak. Further, Plaintiff argues, the patents' licensing history should have been at the forefront of Imation Assistant General Counsel Levinson's attention at the time of the Imation-American Litho negotiations because Imation was involved in a dispute with another entity involving the same patents. (Pl.'s Mem. Opp'n Def.'s Mot. Partial Summ. J. at 13-14; Levinson Dep. at 45-47, Ex. C to Pl.'s Mem.) Nevertheless, Plaintiff contends, Levinson did not look at the Kodak agreement to determine whether it prevented Imation from licensing the patents to American Litho. (Levinson

Dep. at 89-97, Ex. C to Pl.'s Mem.)

Furthermore, Plaintiff maintains that Imation's General Counsel, John Sullivan, had executed the Kodak agreement and as a result, would have talked about fields of use in the course of negotiating that agreement. (Sullivan Dep. at 33, Ex. D to Pl.'s Mem.) Sullivan received email communications regarding the negotiations between Imation and American Litho and does not dispute that Levinson raised American Litho's interest in the patents with him. (Id. at 41-42; 45.) Plaintiff further argues that the executive who signed the License Agreement on Imation's behalf, James Ellis, testified that he had no understanding of how one would determine whether they had a right to license a particular technology nor did he understand the technology encompassed by the patents. (Ellis Dep. at 10, 16, 23-24; 10, Ex. A to Pl.'s Mem.)

In light of Honeywell, and the summary judgment standard of review requiring this Court to view all evidence in the light most favorable to the nonmoving party, the Court recommends that Defendant's Motion for Partial Summary Judgment be denied. Defendant has not established that there are no genuine issues of material fact in dispute and summary judgment is inappropriate given this Court's precedent in Honeywell.

**THEREFORE, IT IS HEREBY RECOMMENDED THAT:**

Defendant's Motion for Partial Summary Judgment (Doc. No. 47) be **DENIED**.

Dated: January 19, 2010

s/Susan Richard Nelson
SUSAN RICHARD NELSON
United States Magistrate Judge

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and serving all parties by **February 3, 2010**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.